# UNITED STATES *v.* NEW YORK & CUBA MAIL STEAMSHIP COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 65.　Argued October 20, 1925.—Decided December 14, 1925.

1. The Act of December 26, 1920, providing, *inter alia,* that " alien seamen " found on arrival in ports of the United States to be afflicted with any of the diseases mentioned in § 35 of the Immigration Act of 1917, shall be placed in a hospital designated by an immigration official, and treated, and that all expenses connected therewith shall be borne by the owner or master of the vessel, applies to seamen who are aliens in personal citizenship, without regard to whether the nationality of the vessel be foreign or domestic. P. 310.
2. As applied to American vessels this provision is not repugnant to the due process clause of the Fifth Amendment, and is within the power of Congress over the exclusion of aliens. P. 313.
297 Fed. 159, reversed; Dist. Ct. affirmed.

CERTIORARI to a judgment of the Circuit Court of Appeals which reversed a judgment of the District Court recovered by the United States from the Steamship Company, representing the hospital expenses incurred in curing a diseased seaman.

*Assistant Attorney General Letts,* with whom *Solicitor General Beck* and *Mr. J. Frank Staley,* Special Assistant to the Attorney General, were on the brief, for the United States.

*Mr. Mark W. Maclay,* with whom *Mr. John Tilney Carpenter* was on the brief, for respondent.

As a general principle, seamen partake of the nationality of the ships upon which they are employed. All seamen, including aliens, regularly employed on vessels of the United States, are " American seamen." *In re Ross,* 140 U. S. 453. This principle has been followed by the Department of State in administering statutory provisions relating to seamen, through the Consular Service, which is governed by the Consular Regulations. Revised Stats. § 4577, which provides for the repatriation of destitute American seamen, has been construed both by the Consular Regulations and by Judge Story as covering seamen of foreign nationality on American vessels. *Matthews* v. *Offley,* 3 Sumn. 115. See *The Santa Elena,* 271 Fed. 347; *The Laura M. Lunt,* 170 Fed. 204; *The Blakeley,* 234 Fed. 959. Aliens or foreigners employed on American vessels are considered as American seamen. Citizens of the United States while employed as seamen on foreign ships are " alien seamen." *Rainey* v. *N. Y. & P. S. S. Co.,* 216 Fed. 449; *The Marie,* 49 Fed. 286; *The Ester,* 190 Fed. 216; *The Albergen,* 223 Fed. 443.

The Act of December 26, 1920, should be construed in accordance with the general doctrine of nationality of seamen. The drastic and highly penal character of this Act require a strict construction. The language and clear intention of the statute do not require application to American shipowners. The provision of the statute for the return of incurable cases is clear as applied to seamen on foreign ships, but is meaningless or absurdly unjust if applied to an alien person shipped at a United States port on an American vessel. *Castner, Curran & Bullitt, Inc.* v. *Hamilton,* 275 Fed. 203; *Neilson* v. *Rhine Shipping Co.,* 248 U. S. 205. Both *United States* v. *Union Supply Co.,* 215 U. S. 50, and *Neilson* v. *Rhine Shipping Co.,* 248 U. S. 205, depend on the same fundamental canon, that a

statute must be construed, if possible, as a harmonious whole, and in such a way as to give effect to all its parts. As the second proviso cannot be given effective meaning unless the words " alien seamen " throughout the Act be construed as not applying to seamen on American vessels, that is a sufficient reason for the construction adopted by the Circuit Court of Appeals.

Finally, if' " it is not thinkable " that the American shipowner engaged in foreign trade should be required to return a diseased alien to the distant country from which he originally came, it is certainly " not thinkable " that Congress intended that American vessels in the coastwise service, employing aliens who contract one of the specified disabilities or diseases during the voyage, be required to return them to their distant native land. Yet if the term " alien seamen " means persons who individually are aliens, even though they are seamen on an American vessel, the Act necessarily applies to coastwise shipping. The legislative history of the Act shows that it was intended to apply to foreign ships, and not to seamen of any individual nationality on vessels of the United States.

The relation, if any, between the Act of December 26, 1920, and the Immigration Laws, does not require the construction of " alien seamen " to mean " alien individuals employed as seamen on American vessels." The Act of December 26, 1920, is not an amendment of the Immigration Act. The subject matter of the Act of December 26, 1920, relates to seamen and public health rather than to immigration. The title and form of the Act of 1920 distinguish it from the immigration statutes. References in the statute to immigration are unimportant. The Act of 1920 differs from the Immigration Act, § 35, in respect of the persons and vessels described and the conditions of liability. *Castner, Curran & Bullitt, Inc.* v. *Hamilton,* 275 Fed. 203. The unconstitutionality of the statute as

applied to owners of vessels of the United States is a sufficient reason for affirming the judgment of the Circuit Court of Appeals.

An examination of the decisions on liability without fault, reveals that statutory liability should not be sustained under the police power, or any other power under the Constitution of the United States, against a defendant who cannot reasonably be said to be in the chain of causation leading to the damage, or in control of the instrumentality which gives rise to it. *Fritz* v. *Railroad,* 243 Mo. 62. The basis of the validity of legislation of this character is found in the fact that the party sought to be charged has control over the instrumentality which causes the damage. *St. Louis & S. F. Ry. Co.* v. *Mathews,* 165 U. S. 1; *Eastman* v. *Jennings-McRae Logging Co.,* 69 Oregon 1. Furthermore, a statute making a railroad absolutely liable for all damage, such as the death of animals occurring on its right of way, without imposing any duty, or without providing for a judicial determination as to whether there has been a breach of duty, is clearly unconstitutional. *Zeigler* v. *South & North Alabama R. R.,* 58 Ala. 594; *Birmingham Mineral R. R.* v. *Parsons,* 100 Ala. 662; *Union Pacific Ry.* v. *Kerr,* 19 Colo. 273; *Wadsworth* v. *Union Pacific Ry.,* 18 Colo. 600; *Cateril* v. *Union Pac. Ry.,* 2 Idaho 540; *Bielenberg* v. *Montana Union Ry.,* 8 Mont. 271; *Atchison, etc. R. R.* v. *Baty,* 6 Neb. 37; *Jensen* v. *Union Pacific Ry.,* 6 Utah 253; *Jolliffe* v. *Brown,* 14 Wash. 155; *Schenck* v. *Union Pacific Ry.,* 5 Wyo. 430.

The same basis of determining what is due process was relied on in two cases in which statutes, not in respect of railroads, but in respect of highway collisions, were held unconstitutional. *Camp* v. *Rogers,* 44 Conn. 291 and *Daugherty* v. *Thomas,* 174 Mich. 371. See *Ex parte Hodges,* 87 Calif. 162.

By the same reasoning, this respondent, which had no control over the contraction of the disease or the condition

of the seaman, should not be held liable for the expenses of treatment as provided in the Act of 1920. In relations between master and servant, although both by the maritime law and also under workmen's compensation statutes, the employer is liable, without fault, for injury to the employee resulting from risks inherent in the employment, or due to its peculiar conditions, such liability does not extend to losses caused by the wilful misconduct of the employee. 25 Harv. L. Rev. 129; *Cudahy* v. *Parramore,* 263 U. S. 418. It is believed that every one of these statutes upheld by the courts has contained a provision exempting the employer from liability for the results of the employee's wilful misconduct. *Missouri Pacific Ry.* v. *Castle,* 224 U. S. 541; *N. Y. Central R. R.* v. *White,* 243 U. S. 188; *Hawkins* v. *Bleakly,* 243 U. S. 210; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Arizona Employers' Liability Cases,* 250 U. S. 400.

Under the maritime law it is well settled that a shipowner is liable, irrespective of negligence, for the maintenance and cure of seamen who are injured or become sick in the course of the employment. *The Osceola,* 189 U. S. 158. As in the case of the express provisions of workmen's compensation acts, the maritime law holds that seamen suffering from venereal disease, or from injury due to their own wilful misconduct, are not entitled to maintenance and cure. *Pierce* v. *Patton* (1833), Gilp. 435. *Chandler* v. *The Annie Buckman* (1853), 21 Betts D. C. (MS.) 112; *The Alector,* 263 Fed. 1007; *The Bouker No. 2,* 241 Fed. 831.

Mr. Justice Sanford delivered the opinion of the Court.

The questions involved in this case relate to the construction and constitutionality of the Act of December 26, 1920, c. 4, 41 Stat. 1082, entitled "An Act to provide for the treatment in hospital of diseased alien seamen." It

provides: " That alien seamen found on arrival in ports
of the United States to be afflicted with any of the dis-
abilities or diseases mentioned in section 35 of " the Alien
Immigration Act of 1917 [1]—including any loathsome or
dangerous contagious disease—" shall be placed in a hos-
pital designated by the immigration officials in charge at
the port of arrival and treated, all expenses connected
therewith  .  .  .   to be borne by the owner  .  .  .   or
master of the vessel, and not to be deducted ·from the
seamen's wages "; and that where a cure cannot be ef-
fected within a reasonable time " the return of the alien
seamen shall be enforced on or at the expense of the vessel
on which they came, upon such conditions as the Com-
missioner General of Immigration, with the approval of
the Secretary of Labor, shall prescribe, to insure that the
aliens shall be properly cared for and protected, and that
the spread of contagion shall be guarded against."

The Steamship Company, a Maine corporation, is the
owner of a merchant vessel of American registry.   On a
voyage from New York to the West Indies and return,
this vessel carried a seaman who was a citizen of Chile.
On returning to New York he was found by the immigra-
tion officials to be afflicted with a venereal disease, and on
the order of the Commissioner of Immigration was placed
in the Public Health Service hospital on Ellis Island for
treatment.   He was later discharged from the hospital as
cured, and admitted into the United States.   The Steam-
ship Company having refused to pay the hospital ex-
penses, the United States brought suit against it in the
Federal District Court for the amount of such expenses
Judgment was recovered, which was reversed by the Cir-
cuit Court of Appeals, on the ground that the Act applied
only to seamen on foreign vessels.   297 Fed. 159.   The
case is here on writ of certiorari.   265 U. S. 578.

---

[1]Act of February 5, 1917, c. 29, 39 Stat. 874.

This decision is in conflict with the earlier decisions in *Franco* v. *Shipping Corporation,* (D. C.) 272 Fed. 542, and *Castner* v. *Hamilton,* (D. C.) 275 Fed. 203, in which the Act was applied to aliens brought in as seamen on American vessels.

The question of construction presented is whether the term " alien seamen," as used in the Act, means seamen who are aliens, as the Government contends, or seamen on foreign vessels, as the Steamship Company contends: that is, whether in applying the Act the test is the citizenship of the seaman or the nationality of the vessel.

We think the term " alien seamen " is not to be construed as meaning seamen on foreign vessels. The general principle that an alien while a seaman on an American vessel is regarded as being an American seaman in such sense that he is under the protection and subject to the laws of the United States, *In re Ross,* 140 U. S. 453, 479, has no application to the question whether aliens employed on American vessels are included within the terms of a special statute dealing solely and specifically with " alien seamen," as such. And if the rule attributing to a seaman the nationality of the vessel should be applied to this Act so as to give to the term " alien seamen " the meaning of " seamen on foreign vessels," it would result, under the terms of its last clause, that an American seaman employed on a foreign vessel who was afflicted with an incurable disease, on being brought into an American port could not be admitted into the United States, but would have to be returned; an anomalous result which, obviously, Congress did not intend.

It is clear that the term " alien seamen " as used in the Act means " seamen who are aliens." It describes, aptly and exactly, seamen of alien nationality, dealing with them, as individuals, with reference to their personal citizenship; and it has no other significance either in common usage or in law. The Act does not qualify this term by

any reference to the nationality of the vessels.   Nor does it use the words "seamen on foreign vessels" or any equivalent phrase which would have been appropriate had it been intended to describe the seamen on such vessels.

This conclusion is emphasized when the Act is considered in the light of the Alien Immigration Act of 1917, and the legislative history showing the condition it was evidently the intention to correct.   *United States* v. *Morrow*, 266 U. S. 531, 535.   The Act of 1917, *inter alia*, dealt specifically with "alien seamen," using that term, as shown by its general definitions and various provisions, as meaning "aliens employed on *any vessel* arriving in the United States from a foreign port."   It provided that, if not within any of the classes excluded by reason of disease or otherwise, they might be admitted into the United States as other aliens, but, if not so admitted, prohibited them from landing, except for certain temporary purposes, under regulations prescribed by the Secretary of Labor; and it required the owner or master of "any vessel" coming from a foreign port to furnish a list of all its alien seamen and not to pay off or discharge them unless duly admitted or permitted to land.   (§§ 1, 2, 32–34, 36.)   And by § 35—which was specifically referred to in the Act of 1920—it was provided that if "any vessel" carrying passengers, on arrival from a foreign port, had on board employed thereon, any alien afflicted with any enumerated disability or disease which had existed when he shipped on the vessel and might then have been detected by competent medical examination, the owner or master of the vessel should pay a fine, and, pending its departure, the alien should be treated in hospital at the expense of the vessel.

There was, however, no provision expressly authorizing the hospital expenses incurred in the treatment of a diseased alien seaman to be charged to the vessel when it carried freight or the disease could not have been detected at the time that he shipped on the vessel.

In this situation the Department of Labor, in 1919, prepared the draft of the bill which later, with minor changes, became the Act of 1920. In a letter transmitting this draft to the Chairman of the House Committee on Immigration and Naturalization, the Secretary stated that the Department was very anxious to have it enacted into law in order to fix definitely " the responsibility of steamship lines and vessels for the expenses which arise from the frequent necessity of placing in hospitals alien seamen who, upon arrival at our ports, are found to be afflicted with various diseases, often of a loathsome or dangerous contagious character "; the existing law not being clear upon this matter. The Committee, in reporting the bill,[2] set forth this letter from the Secretary, and said: " The bill simply provides that the care and treatment in hospital of diseased alien seamen be placed on the same basis as the care and treatment in hospital of diseased aliens, namely, at the expense of the ship or steamship company bringing the diseased alien seamen into this country. At present there is a difference of opinion as to who shall pay the expenses of taking care of these alien seamen who come here and require medical or surgical treatment."

No substantial doubt is cast upon the purpose of the Act by the incidental statement of the Chairman of the Committee in the course of debate, that the bill applied only to foreign ships, especially since, in the same debate, he described it as referring to " sick alien seamen," and stated that it perfected a provision already " partly in the immigration laws" making the owners of vessels responsible for their medical treatment.[3]

In the light of this history, as well as from the face of the Act itself, it is clear that the words " alien seamen " were used in the same sense as in the Act of 1917, with

[2] Ho. Rep. No. 173, 66th Cong., 1st Sess.
[3] 60 Cong. Rec., 66th Cong., 3d Sess., Pt. 1, pp. 600, 601.

which it is *in pari materia,* that is, as meaning aliens employed as seamen on any vessel arriving in the United States; and that it was intended to extend the provisions of § 35 of that Act by providing that the hospital expenses incurred in treating any such diseased alien should be borne in all cases by the vessel bringing him in, whether carrying passengers cr freight, and without reference to the time when the disease might have been detected. And it has been so construed and applied by the Department of Labor.

The Steamship Company, while conceding that the Act as thus construed is constitutional as applied to foreign vessels, contends that as applied to American vessels it is repugnant to the due process clause of the Fifth Amendment in that " it imposes liability without causation or causal connection." This contention is without merit. The power of Congress to forbid aliens and classes of aliens from coming within the borders of the United States is unquestionable. *The Chinese Exclusion Case,* 130 U. S. 581, 606; *Wong Wing* v. *United States,* 163 U. S. 228, 237; *Turner* v. *Williams,* 194 U. S. 279, 289; *Oceanic Navigation Co.* v. *Stranahan,* 214 U. S. 320, 336. Congress may exercise this power by legislation aimed at the vessels bringing in excluded aliens, as by penalizing a vessel bringing in alien immigrants afflicted with diseases which might have been detected at the time of foreign embarkation, *Oceanic Navigation Co.* v. *Stranahan, supra,* p. 332, or by requiring a vessel bringing in aliens found to be within an excluded class, to bear the expense of maintaining them while on land and of returning them, *United States* v. *Nord Deutscher Lloyd,* 223 U. S. 512, 517. There is no suggestion in any of these cases that this power is limited to foreign vessels. It may be exercised in reference to alien seamen as well as other aliens. And if they are found to be diseased when brought into an American port, the vessel, whether American or for-

eign, may lawfully be required to bear the expenses of their medical treatment.

The judgment of the District Court is affirmed, and that of the Circuit Court of Appeals

*Reversed.*